**STATE of North Dakota, Plaintiff and Appellee,**

**v.**

**Larry R. NORDING, a.k.a. Robin Larry Nording, Defendant and Appellant.**

**Cr. No. 910326.**

Supreme Court of North Dakota.

May 12, 1992.

Wendy P. Sulewski (argued), State's Atty., Jamestown, for plaintiff and appellee.

Weiss, Wright, Paulson & Merrick, Jamestown, for defendant and appellant; argued by Thomas E. Merrick, Jamestown.

MESCHKE, Justice.

Larry Nording appealed from an order committing him to the North Dakota State Hospital after a jury found him not guilty of a criminal charge "by reason of lack of criminal responsibility." The order also authorized forced medication as part of Nording's treatment. We affirm.

Nording assaulted his grandmother, causing her permanent injuries, and he was charged with the class C felony of aggravated assault. Under NDCC Ch. 12.1–04.1 and NDRCrimP 12.2, Nording filed a notice of intent to rely on the defense of lack of criminal responsibility because of mental disease or defect at the time of the alleged offense. At the trial on the criminal charge, the jury's verdict found that Nording committed the assault but that he was "not guilty by reason of lack of criminal responsibility." NDCC 12.1–04.1–18(3). The trial court retained jurisdiction of Nording and committed him to the State Hospital for examination by mental health professionals. NDCC 12.1–04.1–21. Both Dr. Karl J. Ulrich of the State Hospital and Dr. Allan D. Zimmerman, a licensed clinical psychologist appointed by the court for Nording, reported that Nording continued to be mentally ill or defective, and that, because there existed a substantial risk of harm to others, inpatient treatment of Nording was necessary.

At a dispositional hearing under NDCC 12.1–04.1–22, the trial court found that Nording was mentally ill, that there was a substantial risk that he would commit a violent criminal act, and that Nording was not a proper candidate for conditional release. The court also found that Nording "had been refusing" medication which, when taken, "stabilized [Nording's] delusions and behavior." The court then committed Nording to the State Hospital for custody, and authorized forced medication for his treatment.

On appeal, Nording argues that his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution[1] and Article I, Section 21 of the North Dakota Constitution[2] were infringed because he was not afforded the same rights and procedures under NDCC Ch. 12.1–04.1 as persons involuntarily committed to treatment facilities by civil proceedings under NDCC Ch. 25–03.1. To clarify Nording's constitutional challenge, we briefly describe the differences in procedures under those separate statutes.

Under NDCC Ch. 25–03.1, an individual cannot be involuntarily committed for treatment unless the State proves by clear and convincing evidence that the patient is mentally ill and poses a serious risk of harm to himself, others, or property. The North Dakota Rules of Evidence apply, the patient is entitled to be at the hearing, and there is a right to an expedited appeal.

---

1. United States Constitution, Amendment XIV, § 1, says, in part:

   [N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

2. North Dakota Constitution, Article I, § 21, says, in part:

   [N]or shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.

Under NDCC Ch. 12.1–04.1, on the other hand, when a jury finds a criminal accused not guilty by reason of lack of criminal responsibility, the trial court can detain that person by commitment to a treatment facility for examination. NDCC 12.1–04.1–21. After a dispositional hearing within ninety days, the court can involuntarily commit the person if the court finds that the person is mentally ill and that there is a substantial risk that the person will commit a criminal act of violence. NDCC 12.1–04.1–22. The burden of proof is on the detainee,[3] not the State, to demonstrate by a preponderance of evidence that the need for commitment or other involuntary treatment does not exist. *Id.* at subsection 4. Although the North Dakota Rules of Evidence do not apply, evidence used at the criminal trial and information from court-ordered examinations of the detainee, if relevant, are admissible. NDCC 12.1–04.1–26. A final order is appealable to this court, but there is no right to an expedited appeal. Jurisdiction of the trial court continues for a period equal to the maximum term of imprisonment that could have been imposed if the detainee had been found guilty. NDCC 12.1–04.1–20(1). Thus, the post-criminal-trial procedures for a detainee are different than those for initial commitment of an involuntary civil patient.

▅ In his equal protection challenge, Nording objects that the detainee under NDCC 12.1–04.1–22 has the burden of proof, that the standard of proof is by a preponderance and not by clear and convincing evidence, that use of the rules of evidence is not required, and that the detainee has no right to an expedited appeal.[4]

The standard of review for analyzing an equal protection claim depends upon the class allegedly discriminated against and the rights allegedly infringed by the classi-

fication. Not long ago, we summarized the standards of review for equal protection challenges:

> We apply strict scrutiny to legislative classifications that are inherently suspect or infringe upon fundamental rights, and we strike down the challenged classification unless it promotes a compelling government interest and the distinction drawn is necessary to further its purpose.... If a legislative classification infringes upon important substantive rights, we apply an intermediate standard of review, and we uphold the classification if it bears a close correspondence to the legislative goals.... We apply a rational basis test to legislative classifications that are not inherently suspect, or do not infringe upon fundamental or important substantive rights, and we uphold the classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose.

*Kavadas v. Lorenzen,* 448 N.W.2d 219, 221–222 (N.D.1989). [Citations omitted.] Nording urges that we should apply the strict scrutiny standard of review in this case because an order of involuntary commitment to a treatment facility affects the fundamental right of "liberty." From decisions on similar equal protection challenges under the United States Constitution in the federal courts, we readily conclude that the appropriate equal protection analysis is something less than strict scrutiny.

The United States Supreme Court has not specifically spelled out which standard to use in these cases. Still, in *Jones v. United States,* 463 U.S. 354, 362 n. 10, 103 S.Ct. 3043, 3048 n. 10, 77 L.Ed.2d 694, 704 n. 10 (1983), the court implies that the rational basis test is appropriate:

---

3. For purposes of this opinion, we use the term "detainee" to mean a person who, in a criminal trial, has been found to have committed the crime charged, but, as a result of mental disease or defect existing when the conduct occurred, has been found "not guilty by reason of lack of criminal responsibility," and who the court has ordered committed to a treatment facility. *See* NDCC 12.1–04.1–01, 12.1–04.1–18(3), and 12.1–04.1–21.

4. Nording also argues that NDCC 12.1–04.1–22 does not require that the detainee be present at the hearing. For two reasons, we conclude that this particular argument is without merit. First, the proceedings under NDCC 12.1–04.1–22 are part of the criminal proceedings at which the defendant has a right to be present. NDRCrimP 43. Secondly, Nording was actually present at all proceedings and, therefore, has no standing to object.

[I]f the Due Process Clause does not require that an insanity [detainee] be given the particular procedural safeguards provided in a civil-commitment hearing under *Addington,* then there necessarily is a *rational basis* for equal protection purposes for distinguishing between civil commitment and commitment of insanity [detainees].... We agree, and therefore address petitioner's arguments in terms of the Due Process Clause.

[Emphasis added.] In *United States v. Cohen,* 733 F.2d 128, 134 (D.C.Cir.1984), the Court of Appeals applied the rational basis test:

It seems unlikely that strict scrutiny of the classification of punishments or impositions on the basis of "fundamental interest" analysis has any place in modern equal protection law.

It is, in any case, clear that the Supreme Court and this court have consistently applied the ordinary rational basis test in their opinions analyzing equal protection problems raised in the civil commitment of criminal defendants acquitted by reason of insanity.

*See also* cases cited in *Cohen,* 733 F.2d at 134. Detainees found not guilty by reason of insanity brought an equal protection challenge in *Hickey v. Morris,* 722 F.2d 543 (9th Cir.1983), alleging that the disparities in the procedures of the State of Washington for civil and criminal commitments were unconstitutionally discriminatory. In rejecting the challenge, the Court of Appeals, although reluctant to announce the appropriate test, concluded the challenged classifications survived even an intermediate or "heightened rational basis" scrutiny.

■ In reviewing both federal and state equal protection claims, this court has generally applied the rational basis test in those cases involving economic or social legislation. *See Lee v. Job Service North Dakota,* 440 N.W.2d 518 (N.D.1989). However, we have been "unwilling to view human life and safety as simply a matter of economics." *Hanson v. Williams County,* 389 N.W.2d 319, 325 (N.D.1986). The order of commitment that Nording has appealed implicates some aspects of both human life and safety. For that reason, the appropriate standard of review for Nording's equal protection challenge under the state constitution may be the intermediate standard requiring "a close correspondence between the statutory classification and legislative goals." *Hanson,* 389 N.W.2d at 324. We deem it unnecessary to determine whether the appropriate review is a heightened test or merely the rational basis test. Because Nording's equal protection challenge would fail if we apply a heightened or intermediate standard of review, his challenge, if we apply a lesser, rational basis standard, necessarily fails as well.

The United States Supreme Court's decision in *Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), is useful for analyzing whether there is a close correspondence between the classification and the legislative goals in this case. In *Jones,* the detainee had successfully defended on insanity, and a jury found him not guilty by reason of insanity. Under the applicable statutes, the detainee was automatically committed to a treatment facility until he could prove by a preponderance of the evidence that he was entitled to be released. The detainee contended that his indefinite involuntary commitment was unconstitutional because proof of his insanity at the criminal trial was based on a preponderance of the evidence whereas, for a civil commitment, the government had to prove mental illness and need for treatment by clear and convincing evidence. The United States Supreme Court expressly recognized that persons found not guilty by reason of insanity constitute a special class that can be constitutionally treated differently from other candidates for mental-health commitment.

The Court in *Jones* held that there are "important differences," between the class of potential civil commitment candidates and the class of insanity detainees after a criminal trial, that justify differing standards of proof. For that reason, the Court concluded that the statutory scheme did not violate constitutional due process rights. Also, the Court said, "Because we determine that [a detainee's] commitment

is based on the judgment of insanity at the criminal trial, rather than solely on the findings at the [post-trial] hearing ..., the relevant equal protection comparison concerns the procedures available at the criminal trial and at a civil-commitment hearing." *Jones*, 463 U.S. at 362, n. 10, 103 S.Ct. at 3048 n. 10, 77 L.Ed.2d at 704 n. 10. The Court explained that commitment under the criminal statute follows only if the detainee himself defends the criminal charge on insanity grounds, and the jury finds that he has committed a criminal act that is a product of his mental illness. The Court declared that "is good reason for diminished concern as to the risk of error." *Jones*, 463 U.S. at 368, 103 S.Ct. at 3051, 77 L.Ed.2d at 708. The Court also explained that a legislative body could reasonably decree that an insanity acquittal supports an inference of continuing mental illness until the detainee demonstrates otherwise.

The Eighth Circuit Court of Appeals in *United States v. Wallace*, 845 F.2d 1471 (8th Cir.1988), rejected a due process attack on similar legislation that imposed the burden of proof upon a detainee, (one who was automatically committed after being acquitted of a crime by reason of insanity), to establish that the detainee's release would not create a substantial risk of injury to the person or property of others. Agreeing with the *Jones* rationale, the court reiterated that there are important differences between potential civil commitment candidates and insanity detainees that justify differential treatment. The court emphasized that proof in the criminal trial that the insanity detainee has committed a criminal act eliminates concern that the detainee will be involuntarily committed for mere "idiosyncratic behavior."

Unlike an involuntary civil patient under NDCC Ch. 25–03.1, who is merely "alleged" to have a mental illness or defect, Nording has already been tried by a jury and found to have a mental disease or defect. Nording's mental state has been determined by the jury because Nording voluntarily raised the question when he asserted his lack of criminal responsibility as a defense to the criminal charge under NDCC Ch. 12.1–04.1. The jury was instructed that it could find Nording "not guilty." It did not do so. Instead, the jury found "beyond a reasonable doubt" that Nording committed the crime charged but also found that he lacked criminal responsibility because of his mental disease or defect.

Although an insanity detainee under NDCC Ch. 12.1–04.1 is not afforded all of the rights that an involuntary civil patient has under NDCC Ch. 25–03.1, a detainee is afforded other protective procedures. Upon entry of the acquittal for lack of criminal responsibility, the trial court can commit the detainee to a treatment facility for examination. NDCC 12.1–04.1–21. However, the court must hold a dispositional hearing within 90 days. NDCC 12.1–04.1–22(1). If the detainee lacks financial resources, the court must expend public funds for the detainee to obtain the assistance of a mental health professional. NDCC 12.1–04.1–22(3). Following the dispositional hearing, the court can involuntarily commit the detainee for custody and treatment only if the court finds that the detainee is mentally ill or defective, that there is a substantial risk that the detainee will commit a criminal act of violence, and that the detainee is not a proper subject for conditional release. NDCC 12.1–04.1–22(4)(b). The detainee is entitled to another review of status within one year after the date of the court's order. NDCC 12.1–04.1–23(2). The detainee may apply to the court for modification of the terms of the commitment order or for an order of conditional release or discharge, and the court must consider and dispose of that application "promptly." NDCC 12.1–04.1–24(2) and (3). Additional periodic reviews are mandated. NDCC 12.1–04.1–23(2) and 12.1–04.1–24(4). These are substantial safeguards.

The purposes of NDCC Ch. 12.1–04.1 are clear. The statute seeks to protect society from persons who commit violent crimes and who suffer from mental illness or defect. The statute also seeks to secure appropriate treatment for those individuals and to release them from involuntary commitment when neither society's protection

nor their welfare requires continued confinement. These goals are similar to those of civil commitment procedures, NDCC Ch. 25–03.1, to ensure that mentally ill persons, who present a serious risk of harm to themselves or others, obtain appropriate treatment while their due process rights are protected. *In the Interest of Nyflot,* 340 N.W.2d 178 (N.D.1983). Although the goals are similar, the differences in the classifications justify different procedures and other safeguards to attain those goals.

A detainee who has successfully defended a criminal charge under NDCC Ch. 12.1–04.1 has already received the full panoply of procedural protections accorded criminal defendants, including the right to be represented by counsel, a presumption of innocence, the burden on the State to prove the criminal conduct "beyond a reasonable doubt," and the safeguards of the rules of evidence and the rules of criminal procedure. It is certainly reasonable for the Legislature to establish other procedures for detaining and committing those persons after the criminal trial, different than those procedures established for persons who are involuntarily brought in for civil mental-health treatment under NDCC Ch. 25–03.1. Unlike detainees under NDCC Ch. 12.1–04.1, involuntary civil patients are merely alleged to have a mental illness that make them dangerous to themselves or others. A civil patient has not been found to have committed a criminal act, and the judicial system has not yet determined that the civil patient is actually mentally ill. Also, an involuntary patient under NDCC Ch. 25–03.1, unlike a detainee under NDCC Ch. 12.1–04.1, has not voluntarily sought the alternative sanctuary of treatment for mental illness, ordinarily. Unlike the criminal detainee, the civil patient has been forcefully brought to treatment for mental illness.

Having carefully compared these statutory procedures, we are convinced that NDCC Ch. 12.1–04.1 has been designed with a close correspondence between the statutory classification and the legislative goals. Accordingly, we hold that Nording's equal protection rights under the federal and state constitutions were not infringed when he was detained and committed for treatment after the jury found that Nording engaged in criminal conduct but was not guilty "by reason of lack of criminal responsibility."

In its commitment order, the trial court authorized the professional staff at the State Hospital to "administer appropriate medication ... to treat [Nording's] mental illness." Nording argues that he was deprived of due process because he received inadequate notice to meet "the allegations of the mental health professional" or to present "the adverse consequences of medication." We disagree.

If the requisite preconditions exist, the trial court "shall order the individual committed to a treatment facility for custody *and treatment*." NDCC 12.1–04.1–22(4)(b). [Emphasis added.] That statutory language was notice to Nording that the court had authority to order treatment for Nording's mental illness.

■ Following the jury verdict, Nording was committed to the State Hospital and examined by Dr. Karl J. Ulrich, a licensed psychiatrist. Dr. Ulrich wrote a letter to the court, that became part of the record before the dispositional hearing was held. The letter said:

Currently, I do not believe that the risk that Mr. Nording will commit an act of violence can be controlled adequately with supervision and treatment if he were to be conditionally released. I firmly believe that he is in need of inpatient treatment at the North Dakota State Hospital. Further, Mr. Nording has a history of becoming non-compliant with antipsychotic medications and it is likely that he will either decline the initiation of medications or agree to initiate medications but then discontinue usage after a short period of time. During previous hospitalizations when Mr. Nording has been treated with antipsychotic medications, there is an apparent improvement in his psychotic symptomatology. Therefore, it may behoove the court to consider the institution of a treatment order whereby Mr. Nording would be directed to use medications. It would be

reasonable to think that if Mr. Nording is hospitalized, treated with medication with resultant improvement in his schizophrenic symptoms, that he could then be considered for alternative treatment on an outpatient basis.

Those statements further notified Nording that the court would be considering the issue of forced medication.

At Nording's request, he was also evaluated by Dr. Allan D. Zimmerman. In his report, Dr. Zimmerman discussed whether structured outpatient treatment could be a viable alternative to inpatient treatment for Nording, and he discussed use of medication:

Mr. Nording has a long history of noncompliance with prescribed psychotropic medications, although he apparently has used such medications sporadically at times.

\* \* \* \* \* \*

Additionally, if it is prescribed, it is likely that injectable psychotropic medication or the daily monitoring of Mr. Nording's taking psychotropic medication would be necessary and that Mr. Nording would need to be involved in intensive treatment with a psychologist and under the supervision and treatment of a qualified psychiatrist.

Dr. Zimmerman's report also placed Nording on notice that forced medication would be considered for his treatment.

We conclude that Nording had sufficient notice to adequately prepare for and to meet the medication question at the dispositional hearing. Nording's due process rights were not infringed by lack of notice to him about that possibility.

At the close of the dispositional hearing, Nording's counsel informed the trial court about recently enacted legislation on the use of forced medication. NDCC 25–03.1–18.1, effective July 11, 1991, details elaborate procedures for a court to authorize involuntary treatment with prescribed medication. Nording's counsel urged the court not to order forced medication without specifically following the procedures spelled out in NDCC 25–03.1–18.1. The court responded in open court that as part of its commitment order Nording "will be given proper medication to t[r]eat his mental illness and that medication will be prescribed by the doctors that are there and as to the amount and when, that's not for this Court to set, it's for the doctors to set."

The question of administering psychotic medications is a complex one. Both the advantages and disadvantages of these drugs have been long debated and are well recognized. *See* Brooks, *The Right to Refuse Antipsychotic Medications: Law and Policy,* 39 Rutgers L.Rev. 339 (1987). *Compare Riggins v. Nevada,* 107 Nev. 178, 808 P.2d 535, *cert. granted,* —— U.S. ——, 112 S.Ct. 49, 116 L.Ed.2d 27 (1991) (May a state force the defendant in a murder case, whose only defense is insanity, to take large doses of an antipsychotic drug during trial?). By enacting NDCC 25–03.1–18.1, the Legislature has recognized the complexity of the question of administering psychotic drugs forcefully. This new legislation is designed to safeguard a patient's right to be free of forced medication unless the prescribed medication is necessary to effectively treat the patient, unless the medication is the least restrictive form of intervention available for the patient's treatment, and unless the benefits of the medication outweigh its known risks to the patient.

Statutes relating to the same subject matter should be construed, if possible, to harmonize them. *Dickinson Public School District No. 1 v. Scott,* 252 N.W.2d 216 (N.D.1977). If there is a conflict, a special or more specific provision must prevail over a general provision relating to the same subject matter. *Cass County Electric Cooperative, Inc. v. Northern States Power Company,* 419 N.W.2d 181 (N.D. 1988). The very specific protections afforded by NDCC 25–03.1–18.1 are applicable to all persons committed for treatment. There is no language under NDCC Ch. 12.1–04.1 that manifests a legislative intent to avoid application of NDCC 25–03.1–18.1 to persons who have been committed for treatment under NDCC Ch. 12.1–04.1. Construing these statutes together, we hold that NDCC 25–03.1–18.1 applies to

insanity detainees who are committed to treatment facilities under NDCC Ch. 12.1–04.1. The court has authority to commit and order treatment under NDCC Ch. 12.1–04.1 but, when the treatment is to include forced medication, the procedural requirements of NDCC 25–03.1–18.1 must be met.

Regarding forced medication, Nording's specific objection is that he received inadequate notice to prepare for that question at the dispositional hearing. We have already concluded that Nording had adequate notice. If Nording believes that he was denied his rights under NDCC 25–03.1–18.1, and if he continues to receive forced medication, his remedy under NDCC 12.1–04.1–24(2) is to "apply to the court for modification of the terms of [his] commitment order...."

In accordance with this opinion, the order of the district court is affirmed.

ERICKSTAD, C.J., VANDE WALLE and LEVINE, JJ., and BRUCE BOHLMAN, District Judge, concur.

BRUCE BOHLMAN, District Judge, sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice JOHNSON, not being a member of this Court at the time this case was heard, did not participate in this decision.