2016 ND 145

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Charles Lee DAVIS, II, Defendant and Appellant.**

No. 20150287.

Supreme Court of North Dakota.

July 20, 2016.

Rozanna C. Larson, Assistant State's Attorney, Minot, ND, for plaintiff and appellee.

Richard E. Edinger, Fargo, ND, for defendant and appellant.

McEVERS, Justice.

[¶ 1] Charles Davis II appeals from a district court's order denying his motion for discharge from his conditional release from the North Dakota State Hospital. We affirm.

I

[¶ 2] In April 2011, the State charged Charles Davis II with murder and theft of a motor vehicle. Lynne Sullivan, a forensic psychologist at the State Hospital evaluated and diagnosed Davis with schizophrenia, paranoid type, and concluded he was not criminally responsible for his acts. Davis entered unopposed pleas of not guilty by lack of criminal responsibility to both charges under N.D.C.C. ch. 12.1–04.1. In August 2012, the district court found Davis mentally ill or defective and that there was a substantial risk, as a result of mental illness or defect, that Davis would commit a criminal act of violence threatening another with bodily injury or inflicting property damage and Davis was not a proper subject for conditional release. The district court committed Davis to the North Dakota State Hospital and advised Davis that his commitment could last for the remainder of his natural life under N.D.C.C. § 12.1–04.1–20(1).

[¶ 3] In May 2013, Davis filed a notice that he would be seeking a discharge at his annual review hearing. In June 2013, Sullivan filed an annual treatment update. Sullivan reported that, due to Davis's consistently good behavior, he was given additional privileges, including transfer to transitional living on the State Hospital's campus. Sullivan's report indicated Davis obtained outside employment, working up to fifty hours per week, took and monitored his own medications, and displayed no symptoms of paranoid schizophrenia since his commitment. Sullivan recommended that the district court continue Davis's commitment and gradually transition him back into the community.

[¶ 4] In September 2013, after an annual review hearing, the district court ordered Davis's conditional release and discharge from the State Hospital after finding he continued to suffer from a mental illness and was in need of treatment and supervision. The district court found the risk that Davis will commit, as

the result of mental illness or defect, a criminal act of violence, was adequately controlled with supervision and treatment. The district court ordered the Department of Human Services be responsible for the supervision of Davis while conditionally released to transitional living. Included in the order were conditions Davis was required to follow for the appropriate protection of society.

[¶ 5] In July 2014, Sullivan filed an annual treatment update. Sullivan reported that Davis continued to suffer from paranoid schizophrenia, but that it is well managed with medications. Sullivan reported Davis had been compliant with taking medications, kept therapy appointments, and generally maintained good mental health. Sullivan also recommended that Davis be granted increased travel privileges if he was not already discharged by the next review hearing.

[¶ 6]In September 2014, Krislea Wegner, an independent psychologist, conducted a civil commitment evaluation. Wegner reported that Davis successfully transitioned to independent living without incident or setback, and that he had enough insight regarding his treatment regimen to seek out services and resources · if stress or additional mental health symptoms became a factor. Wegner concluded that, while there was a potential risk of deterioration if Davis chose to stop taking his medications, there was no behavioral data to suggest that risk was a current concern. At his September 2014 annual review hearing, Davis testified about his treatment with his psychiatrist at the Veterans Health Administration ("V.A.") and requested his care be transferred to the V.A. The district court voiced concern that there was nothing in writing indicating the V.A. would accept full responsibility for Davis's care. The district court continued Davis's conditional release.

[¶ 7] In March 2015, Davis moved for discharge under N.D.C.C. § 12.1–04.1–25(5). At the discharge hearing, Wegner and Sullivan both testified there is not a substantial risk at the present time that Davis will commit· a crime based on his mental illness. Wegner recommended that Davis be discharged. Sullivan testified she had no objection to Davis's professional services being transferred to providers at the V.A., so long as any medication noncompliance would be immediately reported to the Executive Director. Neither a representative nor doctor from the Veterans Administration testified at the hearing regarding its position.

[¶ 8] The district court requested post hearing briefs for the parties to further address Davis's discharge from conditional release. After reviewing the parties' briefs, the district court found there is not a substantial risk that Davis will commit a criminal act of violence threatening another individual with bodily injury or inflicting property damage, qualifying its finding by also finding that the risk of potential subsequent schizophrenic episodes increase if medications are stopped. The district court continued its September 2013 order for conditional release to ensure medication compliance for the protection of Davis and society. Davis appeals the district court's order continuing his conditional release and denying his discharge.

## II

[¶ 9] Davis argues the district court "usurped its authority" by ignoring the plain language of N.D.C.C. § 12.1–04.1–25(5) and failing to discharge him from conditional release as mandated under N.D.C.C. § 12.1–04.1–25(5)(a). According to Davis, a preponderance of the evidence supports a discharge under subdivision (a) and the district court mischaracterized the experts' testimony in order to continue his

conditional release under N.D.C.C. § 12.1–04.1–25(5)(b), contrary to the statute. The State argues the district court had the authority, under the plain language of the statute, to continue Davis's conditional release under N.D.C.C. § 12.1–04.1–25(5)(b) and was not required to discharge him under N.D.C.C. § 12.1–04.1–25(5)(a).

[¶ 10] We have not had an opportunity to interpret N.D.C.C. § 12.1–04.1–25(5). However, in *State v. Nording*, we articulated the purposes of the Criminal Responsibility and Post–Trial Responsibility Act, N.D.C.C. ch. 12.1–04.1:

> The purposes of NDCC Ch. 12.1–04.1 are clear. The statute seeks to protect society from persons who commit violent crimes and who suffer from mental illness or defect. The statute also seeks to secure appropriate treatment for those individuals and to release them from involuntary commitment when neither society's protection nor their welfare requires continued confinement.

485 N.W.2d 781, 785–86 (N.D.1992).

[¶ 11] "Statutory interpretation is a question of law, fully reviewable on appeal." *Teigen v. State*, 2008 ND 88, ¶ 19, 749 N.W.2d 505. "When interpreting a statute, we first look to the language itself and determine whether it is unambiguous on its face." *State v. Hafner*, 1998 ND 220, ¶ 10, 587 N.W.2d 177. As we explain in *Rasnic v. ConocoPhillips Co.*, 2014 ND 181, ¶ 14, 854 N.W.2d 659:

> Words in a statute are given their plain, ordinary, and commonly understood meaning unless defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1–02–02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1–02–07. If the language of a statute is clear and unambiguous, the letter of the statute must not be disregarded under the pretext of

pursuing its spirit. N.D.C.C. § 1–02–05. If the language of a statute is ambiguous, however, a court may resort to extrinsic aids to determine the intention of the legislation, including the object sought to be attained, the circumstances under which the legislation was enacted, and the legislative history. N.D.C.C. § 1–02–39. A statute is ambiguous if it is susceptible to different, rational meanings. *State v. Meador*, 2010 ND 139, ¶ 11, 785 N.W.2d 886.

We presume that "[a] just and reasonable result is intended." N.D.C.C. § 1–02–38.

[¶ 12] Section 12.1–04.1–25(5), N.D.C.C., provides:

> Upon application by an individual conditionally released ... *the court shall determine whether to continue, modify, or terminate the order.* The court shall consider and dispose of an application promptly. In a proceeding under this section, the applicant has the burden of proof by a preponderance of the evidence. The court shall enter an order in accordance with the following requirements:
>
> a. If the court finds that the individual is not mentally ill or defective or that there is not a substantial risk that the individual will commit, as a result of mental illness or defect, a criminal act, it shall order that the individual be discharged from further constraint under this chapter.
>
> b. If the court finds that the individual is mentally ill or defective, but that there is not a substantial risk that the individual will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage, it may modify the conditions of release

as appropriate for the protection of society.

c. If the court finds that the individual is mentally ill or defective and that there is a substantial risk that the individual will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage and that the individual is no longer a proper subject for conditional release, it shall order the individual committed to a treatment facility for custody and treatment. If the court finds that the individual is mentally ill or defective and that there is a substantial risk that the individual, as a result of mental illness or defect, will commit a nonviolent criminal act, it may order the individual to report to any treatment facility for noncustodial evaluation and treatment and to accept nonexperimental, generally accepted medical, psychiatric, or psychological treatment recommended by the treatment facility.

(Emphasis added.)

[¶ 13] Construing this statutory language, "we are guided by the rule that we interpret statutes in context and in relation to others on the same subject to give meaning to each without rendering one or the other useless." *BASF Corporation v. Symington*, 512 N.W.2d 692, 696 (N.D.1994). Further, "we attempt to harmonize statutes to avoid conflict between them." *Id.*

[¶ 14] Chapter 12.1–04.1, N.D.C.C., provides three separate sections providing for the disposition of and the possible commitment and levels of constraint that may be imposed upon a person who has committed a crime, but is not criminally responsible for the crime based on the defendant being mentally ill or defective. *See*

N.D.C.C. §§ 12.1–04.1–22; 12.1–04.1–24; 12.1–04.1–25. Section 12.1–04.1–22 relates to the initial order of disposition; section 12.1–04.1–24 relates to modification of commitment; section 12.1–04.1–25 relates to the modification of an order allowing conditional release. All three sections require the discharge of an individual if the court finds the individual is not mentally ill or defective or that there is not a substantial risk, as a result of a mental illness or defect, that the individual will commit a criminal act. *See* N.D.C.C. §§ 12.1–04.1–22(4)(a); 12.1–04.1–24(3)(a); 12.1–04.1–25(5)(a). All three sections also contemplate an individual committed may pose various levels of risk to society and grants the district court discretion to order the individual to varying levels of care, from commitment at a treatment facility, to supervision and treatment, or to treatment without supervision, depending on the risks found. *See* N.D.C.C. §§ 12.1–04.1–22(4)(b)–(c); 12.1–04.1–24(3)(b)–(c); 12.1–04.1–25(5)(b)–(c). Because these three sections are interrelated, we review their application to Davis.

[¶ 15] In the original dispositional order, the district court found Davis to be mentally ill or defective and that there was a substantial risk he would commit an act of violence and was not a proper subject for conditional release. This finding was made under N.D.C.C. § 12.1–04.1–22(4)(b), which provides:

If the court finds that the individual is mentally ill or defective and that there is a substantial risk, as a result of mental illness or defect, that the individual will commit a criminal act of violence threatening another individual with bodily injury or inflicting property damage and that the individual is not a proper subject for conditional release, it shall order the individual committed to a treatment facility for custody and treatment. If

the court finds that the risk that the individual will commit an act of violence threatening another individual with bodily injury or inflicting property damage will be controlled adequately with supervision and treatment if the individual is conditionally released and that necessary supervision and treatment are available, it shall order the person released subject to conditions it considers appropriate for the protection of society. Under subdivision (b), the district court is required to order the mentally ill individual to in-patient treatment if there is a substantial risk to commit an act of violence *and* the individual is not a proper subject for conditional release. N.D.C.C. § 12.1–04.1–22(4)(b). The statute does not identify what makes an individual a proper subject for conditional release, but it is apparently a combination of the risk level and the availability of appropriate treatment and supervision available in an out-patient setting that would reduce the associated risk, as noted in the second sentence of the subdivision.

[¶ 16] After the individual has been committed under N.D.C.C. § 12.1–04.1–22, they may apply for modification of the terms of commitment under N.D.C.C. § 12.1–04.1–24(3). Again, based on the findings made, the district court may discharge the individual or vacate the commitment order and order the individual to report to a treatment facility for noncustodial evaluation and treatment, or order the individual released subject to supervision, treatment, and conditions it considers appropriate for the protection of society. N.D.C.C. § 12.1–04.1–24(3)(a)–(c). To vacate a previous order committing a person to a treatment facility, the district court must find that, even though an individual is still mentally ill or defective, there *is not a substantial risk* the individual will commit a criminal act of violence. N.D.C.C. § 12.1–04.1–24(3)(b).

[¶ 17] When Davis applied for modification of the original commitment order in 2013, the district court did not find there was not a substantial risk to commit any criminal act. Therefore, Davis was not eligible to be fully discharged under N.D.C.C. § 12.1–04.1–24(3)(a). The district court did not make any specific finding that Davis was not a substantial risk to commit an act of violence. However, the district court modified the order on the basis that the risk that Davis would commit an act of violence could be adequately controlled through supervision and treatment and ordered him released subject to conditions appropriate for the protection of society under N.D.C.C. § 12.1–04.1–24(3)(c). By modifying the commitment order, the district court effectively vacated the order committing Davis to the State Hospital thereby implicitly finding that there was not a substantial risk that Davis would commit a criminal act of violence because the risk could be adequately controlled though supervision and treatment by the Department of Human Services. Similar to the conditional release language under N.D.C.C. § 12.1–04.1–22(4)(b), the level of risk necessary to apply subdivision (c) is not identified, where elsewhere in the statute the term "substantial risk" is used. Chapter 12.1–04.1, N.D.C.C., does not define "substantial risk." However, we give words in a statute their plain, ordinary, and commonly understood meaning. *State v. Rufus*, 2015 ND 212, ¶ 15, 868 N.W.2d 534; see N.D.C.C. § 1–02–02. The plain, ordinary meaning of "substantial" is "considerable in quantity: significantly great … being largely but not wholly that which is specified." Merriam–Webster's Collegiate Dictionary 1245 (11th ed.2005). Logically, subdivision (c) is to be applied when there is a risk level less than a "substantial risk," and that the risk is not such that requires

commitment to a treatment facility, because the risk can be controlled adequately with supervision and treatment through conditional release.

[¶ 18] This brings us to Davis's application to terminate the conditional release order. The applicant has the burden to establish the requirements have been met by a preponderance of the evidence. *See* N.D.C.C. § 12.1–04.1–25(5). When an application is brought under N.D.C.C. § 12.1–04.1–25(5), a district court must determine whether to continue, modify, or terminate an order for conditional release and enter an order consistent with the requirements, as codified under subdivisions (a), (b), and (c).

[¶ 19] Section 12.1–04.1–25(5)(a)–(c), N.D.C.C., identifies varying levels of risk an individual poses to society and mandates the district court enter an order in accordance with the individual's probable threat to society based on a preponderance of the evidence presented. Subdivision (c) allows the district court to recommit an individual who is no longer a proper subject for conditional release, or to order unsupervised treatment if the only substantial risk is that the individual will commit a nonviolent crime. Subdivision (c) is not at issue and will not be further discussed. Subdivision (a) identifies the lowest level of risk an individual poses to society—either the individual does not suffer from a mental illness or defect, or the individual suffers from a mental illness or defect, but there is not a substantial likelihood the individual will commit *any* criminal act as the result of mental illness. Under subdivision (a), if the district court finds there is not a substantial risk the individual will commit a crime as the result of mental illness, the individual must be discharged.

[¶ 20] Subdivision (b) identifies a greater risk that an individual poses to society—the individual suffers from a mental illness or defect, but there is not a substantial likelihood that the individual will commit a criminal act of violence against people or property if there are conditions of release that are appropriate for the protection of society. The plain language in subdivision (b) that "it may modify the conditions of release as appropriate for the protection of society" affords the district court discretion to consider the circumstances and all relevant factors in determining whether to modify its order for conditional release. Under subdivision (b), a district court may determine there is not a substantial likelihood the individual will commit, as the result of mental illness or defect, a criminal act of violence against people or property, while still recognizing there is potential for otherwise unknown risks the individual may pose to society that are controlled by the conditions of release. After consideration of varying levels of risks, the district court may modify or continue its order for conditional release in accordance with the protection of society.

[¶ 21] Our interpretation of the application of N.D.C.C. § 12.1–04.1–25(5)(a) and (b) is consistent with the purposes of N.D.C.C. ch. 12.1–04.1, as we articulated in *Nording*, 485 N.W.2d at 785–86. Because only one rational interpretation of the statute exists, and the parties do not argue the contrary, we conclude N.D.C.C. § 12.1–04.1–25(5) is unambiguous.

### III

[¶ 22] Davis argues he has proven, by a preponderance of the evidence, that there is not a substantial likelihood he will commit a criminal act as the result of mental illness or defect and, therefore, the district

court was required to discharge him under N.D.C.C. § 12.1–04.1–25(5)(a).

[¶ 23] Under N.D.C.C. § 12.1–04.1–25(5), Davis has the burden of proof by a preponderance of the evidence. Based on the evidence presented, the district court is required to make findings regarding the individual's mental status and level of risk under N.D.C.C. § 12.1–04.1–25(5), which are governed by the clearly erroneous standard of review. *See State v. Saavedra*, 406 N.W.2d 667, 669 (N.D.1987); *see also State v. Holbach*, 2014 ND 14, ¶ 9, 842 N.W.2d 328 (applying clearly erroneous standard to review whether a preponderance of the evidence supports a defendant's competence to stand trial). Accordingly, we will review a district court's factual findings under N.D.C.C. § 12.1–04.1–25(5) under the clearly erroneous standard. "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, a reviewing court, on the entire evidence is left with a definite and firm conviction a mistake has been made." *Holbach*, 2014 ND 14, ¶ 10, 842 N.W.2d 328. "Under that standard, the district court assesses the credibility of witnesses and resolves conflicts in the evidence, and this Court does not reweigh the evidence, make independent findings of fact, or substitute its judgment for that of the district court." *Id.* "In a proceeding under section[ ] ... 12.1–04.1–25, the North Dakota Rules of Evidence do not apply. If relevant, evidence adduced in the criminal trial of the individual and information obtained by court-ordered examinations of the individual ... are admissible." N.D.C.C. § 12.1–04.1–26(3).

[¶ 24] The parties do not dispute that Davis suffers from a mental illness, requires medication, medication monitoring, case management, and psychotherapy.

However, Davis argues the district court mischaracterized the testimony in the underlying proceeding in order to apply subdivision (b). In its order denying Davis's discharge, the district court found:

1. That Davis continues to suffer from a mental illness.

2. That Davis continues to require medication as a result of his mental illness.

3. That medication monitoring, case management and psychotherapy are necessary in order to monitor signs of stress and Davis' ability to cope with stress.

4. Based on the testimony of Dr. Wegner and Dr. Sullivan and pursuant to N.D.C.C. § 12.1–04.1–25(5)(a), there is not a substantial risk that Davis will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage at the present time. However, the Court also finds that based on Dr. Wegner and Dr. Sullivan's reports, the risk of potential mental health episodes increases if medications are stopped.

5. Pursuant to N.D.C.C. § 12.1–04.1–25(5)(b), in order to ensure the continued protection of society and to ensure that Davis continues to take his medications, the terms and conditions of the September 25th 2013 Conditional Release shall remain unchanged.

[¶ 25] The district court referenced both subdivision (a) and (b) in its order denying Davis's application for discharge. However, while the district court cited subdivision (a) in its order, its reasoning was consistent with the law under subdivision (b). The district court did not make the requisite findings under subdivision (a) to effectuate Davis's release. The district

court did not find Davis was not mentally ill or that there is not a substantial risk that he will commit, as a result of his mental illness, a criminal act. The court specifically found "there is not a substantial risk that Davis will commit, as a result of mental illness or defect, *a criminal act of violence threatening another individual with bodily injury or inflicting property damage* at the present time," which is the requirement under subdivision (b). (Emphasis added.)

[¶ 26] In its memorandum opinion, the district court provided its analysis of the statute:

It is this Court's belief that the legislative intent of N.D.C.C. § 12.1–04.1–25(5) was that *all* subdivisions of any statute be read and interpreted in the context of one another, rather than via piecemeal analysis. Here, because N.D.C.C. § 12.1–04.1–25(5) is not limited to solely subdivision (a), it is this Court's belief the legislative intent of N.D.C.C. § 12.1–04.1–25(5)(a)–(c) was to provide the Court with further alternatives when assessing whether to continue, modify or terminate a conditional release. Because there is nothing in the record to substantiate that there is a significant risk that Davis will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage, the Court does not believe sub[division] (c) N.D.C.C. § 12.1–04.1–25(5) is applicable in the present situation at this time. Accordingly the Court is required to apply the statutory provision set forth in either sub[division] (a) or (b). [Emphasis in original.]

The district court recognized it was required to apply the provisions set forth in either subdivision (a) or (b), which confirms the district court intended to apply only one subdivision.

[¶ 27] In continuing the order for conditional release under subdivision (b), the district court made extensive findings of fact:

Dr. Wegner's August 5th 2015 Commitment Evaluation states that there is "a potential risk for deterioration if he chooses to stop taking his medications, yet there is no behavioral data to suggest this factor being a current concern."

Although both medical experts agreed that Davis has been compliant with his medication regime and that at present, there is not a substantial risk that Davis will commit a crime, it cannot be ignored that under the terms of the Conditional Release, Davis is required by Court order to ... tak[e] all prescribed medications and submit[ ] to medication monitoring. In the event of non-compliance, the Department of Human Services is able to take Davis in to custody pursuant to N.D.C.C. § 12.1–04.1–25(5)(c). Thus, the Conditional Release has contemplated and built in a "safety net" to ensure Davis, as well as the public, is adequately protected in the event of medication or service intervention noncompliance. [Emphasis omitted.]

. . .

The Court has been provided with no empirical or statistical data regarding how common it is for persons suffering from paranoid schizophrenia to cease taking their medications, but according to Dr. Sullivan's testimony at the Dispositional Hearing, "That does frequently happen." ... In light of the heinous nature of the seemingly unprovoked and random event that occurred ... this Court cannot, in good faith, defer to Davis the discretion to decide whether or not to take his medications, as the risk to Davis himself and society at large

is simply too great were Davis to stop taking his medication.

[B]ecause the VA is a federally operated entity, the district court does not believe, nor has the State provided the Court with any authority, evidencing that the district court has jurisdiction over the VA. Thus, the Court is unaware as to how it can order the VA to accept and supervise Davis. Further because there has never been any appearance in these proceedings by any individual associated with the VA, the Court is without information as to the VA's position.

For the sake of argument, even if the VA were in a position to monitor Davis and communicate any concerns to South Central Human Service Center ... it is unclear who would have the authority and perhaps more importantly, the liability, for Davis' on-going medical care should Davis suffer a subsequent schizophrenic episode. Thus, it would appear that the only manner in which the VA could assume full responsibility of Davis' care would be for Davis to be fully discharged from the Department of Human Services, resulting in Davis having the discretion to determine whether or not to continue to take his medications. The Court does not believe it is in the best interests and protection of Davis nor society to afford Davis the sole decision making authority to decide whether or not to take his anti-psychotic medications.

Should Davis be dismissed from the Conditional Release, the Court no longer has jurisdiction over Davis. As such, in the event of a complication or subsequent mental health exacerbation, the recourse would be to petition the Court for a mental health commitment, a process that could take time to accomplish. Again, in consideration of the relatively sudden on-set of Davis' prior schizophrenic episode, the Court does not be-

lieve any delays in time would be in society, or Davis', best interests. Moreover, by discharging Davis from the conditional release, medical services would no longer be mandated via court order, again, meaning it would be in Davis' discretion to determine whether or not to continue with therapy and his medication.

... Although Dr. Wegner and Dr. Sullivan describe Davis as being in "remission," neither opined that Davis is or will be "cured"—to the contrary. There is no dispute from Dr. Wegner nor Dr. Sullivan that schizophrenia is a life-long illness, which requires long term intervention.

... The best way to ensure continued compliance is to continue the terms and conditions of his conditional release.

▉▉▉ [¶ 28] Despite a passing reference to subdivision (a), the district court's findings, read in totality, support its conclusion not to discharge Davis under subdivision (a), and shows the district court's intent to apply subdivision (b). "We will not set aside a correct result based on correct reasoning under the wrong law if the result would be the same under the correct law." *Guardianship of P.T.*, 2014 ND 223, ¶ 12, 857 N.W.2d 367 (citing *Investors Title Ins. Co. v. Herzig*, 2010 ND 169, ¶ 40, 788 N.W.2d 312). Although both experts testified there is not a substantial risk that Davis will commit a criminal act resulting from mental illness or defect, Davis's argument that the district court was required to enter a discharge order under subdivision (a) is flawed. Under N.D.C.C. § 12.1–04.1–25(5), the district court is required to enter an order in accordance with its findings, not in accordance with the expert testimony. The district court found "there is not a substantial risk that Davis will commit,

as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage at the present time." While both experts testified that there is not a substantial likelihood that Davis will commit a criminal act, the district court is not required to find the same if other evidence supports a different conclusion. While a district court cannot arbitrarily disregard expert testimony, it can assign the weight to give it and the district court does not have to accept experts' opinions as conclusive. *Brandt v. Brandt*, 523 N.W.2d 264, 266 (N.D.1994). Further, in *Stillwell v. Cincinnati Inc.*, we stated:

> The trier of fact need not accept testimony and the opinion of an expert, even if the testimony is undisputed.... The weight and credibility attributable to an expert's testimony and opinion is essentially a factual question for the trier of fact and the "clearly erroneous" standard of Rule 52(a), North Dakota Rules of Civil Procedure, applies.

336 N.W.2d 618, 621 (N.D.1983).

[¶ 29] Davis must prove, by a preponderance of the evidence, he is entitled to discharge under subdivision (a). In its memorandum opinion, the district court identified multiple examples of uncertainty pertaining to the risks associated with Davis's mental illness. Neither party presented any empirical or statistical data regarding the likelihood Davis will stop taking medications over time. However, the district court found schizophrenics frequently stop taking medications, which would result in future psychotic episodes, based on Sullivan's testimony at Davis's dispositional hearing in 2012. Sullivan also reported at the 2012 dispositional hearing that symptoms of paranoid schizophrenia may recur spontaneously and that, if medication ceases, there is a high probability that he will become psychotic again.

[¶ 30] Additionally, the district court, in making its determination under subdivision (b), made multiple findings in considering the protection of society. Sullivan previously reported it being "absolutely necessary" for Davis to remain compliant with medications and to undergo psychiatric monitoring because the risk of violence he poses to society will be high if untreated. Additionally, Davis's medical expert recommended in a 2012 psychological examination "long-term psychiatric hospitalization and treatment" and, in the event of Davis's release, recommended "careful monitoring of his condition, particularly to be sure that he is taking prescribed medication and otherwise following through with recommended treatment." Davis contemplated that the V.A. would service his mental health needs. However, the district court was provided no legal authority to order a federally operated entity to supervise Davis, nor was it provided with evidence that the V.A. was willing to accept responsibility for Davis's mental health needs.

[¶ 31] The district court also identified that the current order for conditional release contains a "safety net" that enables the Department of Human Services to take immediate custody of Davis for the protection of society in the event he becomes medication noncompliant. Should Davis be discharged, the district court realized the risks of a potential delay should Davis require a mental health commitment. The district court found it not in society's, or Davis's, best interests for any delays in time "in consideration of the relatively sudden on-set of Davis' prior schizophrenic episode." In the 2014 hearing, when the district court denied modification of the conditional release, the district court asked for written verification that the V.A. was willing to supervise Davis's treatment. No

such testimony or evidence was provided at the 2015 hearing.

[¶ 32] After reviewing the entire record, evidence in the record supports the district court's findings of fact and we are not left with a definite and firm conviction a mistake has been made. Therefore, the district court's findings that there is not a substantial risk that Davis will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage and that medication monitoring, case management, and psychotherapy are still necessary are not clearly erroneous. After making such findings, the district court, in its discretion, may modify the conditions for release as appropriate for the protection of society. The district court did not err in concluding Davis failed to prove, by a preponderance of the evidence, that he is entitled to discharge under subdivision (a).

IV

[¶ 33] We affirm the district court's order denying Davis's motion for discharge from conditional release.

[¶ 34] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 35] I respectfully dissent.

[¶ 36] The majority opinion correctly recites the distinct three provisions of the statute at issue and then, as did the district court, blends two of the provisions, to reach an impermissible result based upon the evidence before the district court.

[¶ 37] Once a person has been found not guilty of a crime by reason of lack of criminal responsibility and committed for treatment under Chapter 12.1–04, that person has the burden to establish that he is entitled to a modification of his commitment or to a discharge. His burden is by a preponderance of the evidence. This is not a burden of proof beyond all possibilities, but that is the burden the district court and the majority opinion have imposed upon Davis.

[¶ 38] Section 12.1–04.1–25(5)(a), N.D.C.C., requires the district court to discharge a person who is mentally ill, as Davis is, but who poses no *substantial risk* of committing a criminal act—"it *shall* order that the individual be discharged from further constraint under this chapter." (Emphasis added). The majority opinion relies upon the fact that the district court failed to make the necessary finding that Davis poses no substantial risk of committing a criminal act and instead made the finding, purportedly under § 12.1–04.1–25(5)(a), "there is not a substantial risk that Davis will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage at the present time. However, the Court also find[s] that based on Dr. Wegner and Dr. Sullivan's reports, the risk of potential subsequent schizophrenic episodes increase if medications are stopped." The district court has blurred two sections of the statute, imposed an impermissible burden of proof on Davis under the statute and the evidence presented at this hearing, and mischaracterized evidence filed with the court and offered at the hearing. Instead, the district court is relying on evidence heard years ago.

[¶ 39] Both doctors filed reports prior to the hearing and both testified. In the two-page report of Dr. Sullivan, the State's expert, there is *no* discussion of the potential for subsequent schizophrenic episodes if medications are stopped. In her testimony, Dr. Sullivan was asked:

Q. Now the end of your report you indicate that there may still be a risk. Is that correct or is that—am I putting words in your mouth? Or during your report and Doctor Wegner's?

A. I don't believe I explicitly stated that there was a risk.

[¶ 40] Rather, the end of Dr. Sullivan's report states:

In conclusion, Mr. Davis continues to suffer from Schizophrenia, Paranoid Type, but this is well managed with medications. He has been very compliant with taking medications, keeping therapy appointments, and generally maintaining good mental health. Mr. Davis has been compliant with all other recommendations and expectations of DHS to date.

[¶ 41] Dr. Sullivan's testimony at the hearing confirmed her report: "Mr. Davis has been self administering medications for some time now, several months. And has again demonstrated no problems with that at all."

[¶ 42] Dr. Wegner's report said this about the potential for discontinuing medication:

There is a potential risk of deterioration if he chose to stop taking his medications, yet there is no behavioral data to suggest this factor being a current concern. There is also no behavioral data to suggest he is at substantial risk of committing a criminal act as a result of his mental illness if he were to be released from the commitment. Mr. Davis appears to have enough insight and acquired learning from his treatment regimen to seek out services and resources if stress or additional mental health symptoms became a factor. A safety plan addressing these potential risks is currently in place and all requirements appear to be met for minimal risk to the community or self.

[¶ 43] The district court relied on testimony from Davis's August 2012 dispositional hearing, rather than the evidence of Davis's present status. The district court reasoned that there is a potential Davis will discontinue taking medication, as described by Dr. Wegner, and the court was "provided with no empirical or statistical data regarding how common it is for persons suffering from paranoid schizophrenia to cease taking their medications." Knowing the statistical frequency in which a sampling of people who suffer from this mental illness will act in this manner simply does not address the issue of whether Davis presents a substantial risk to do so and, further, whether he presents a substantial risk to commit a crime. The evidence in this case addressed the likelihood that Davis would stop taking his medication, or would commit a crime, and the court is obliged to measure his entitlement to be discharged by that evidence, not by a statistical measure.

[¶ 44] The court's other proffered explanation is that it is not in the "best interests and protection of Davis nor society to afford Davis the sole decision making authority to decide whether or not to take his anti-psychotic medications." That is again restructuring the test under the statute. The legislative policy is stated clearly: when a person who is mentally ill, but is no longer by reason of that mental illness a substantial risk to commit any crime, that person is entitled to a discharge. N.D.C.C. § 12.1–04.1–25(5)(a). The courts, under the paternalistic guise of protecting society, are not entitled to thwart that policy by denying a discharge. The statute determines the protections society requires.

[¶ 45] When specifically asked the triggering question under subsection (a) of N.D.C.C. § 12.1–04.1–25(5), Dr. Sullivan

acknowledged there is no substantial risk Davis will commit a crime, if discharged:

Q. Okay. Doctor would you agree, currently, that based on Mr. Davis's mental illness there is not a substantial risk he will commit a crime?

A. I believe based on his current presentation his ongoing compliance with medications, I believe that isn't a substantial risk at this time.

Q. Okay. Assuming arguendo, Mr. Davis is discharged completely—via court order, is there a substantial risk based on his mental illness that Mr. Davis will commit a crime?

A. I'm not seeing—could you rephrase the question, please?

Q. If Mr. Davis is discharged by the Court, is there a substantial risk Mr. Davis based on his mental illness will commit a crime?

A. I don't believe there's a substantial risk.

[¶ 46] Dr. Wegner also testified:

Q. Do you have an ultimate opinion if Mr. Davis should be discharged from release of the executive director's custody?

A. I do believe he's prepared for discharge.

Q. Now currently based on Mr. Davis's mental illness is there a substantial risk he will commit a crime?

A. No.

Q. If Mr. Davis is discharged by the Court based on his mental illness, is there a substantial risk he will commit a crime?

A. No.

Q. And could you tell the Court why you have that opinion?

A. He's demonstrated consistent stability for years. He's demonstrated medication compliance. He has ob-

tained insurance, he's obtained gainful employment, he's made North Dakota the resident of his—the residence of his family. He has obtained duplicate services and demonstrated a willingness to see two psychiatrists and two psychologists to show his stability. And in all four of those individual's records they all note a well-functioning, in remission individual that is at low risk for risk of harm to self or others.

[¶ 47] A decision should not be insulated from review because of the district court's failure to make a necessary finding of fact. It is undoubtedly true that "there is not a substantial risk that Davis will commit, as a result of mental illness or defect, a criminal act of violence threatening another individual with bodily injury or inflicting property damage at the present time." This has been true since Davis was granted conditional release in September 2013. It is also not the fact at issue. Davis filed a petition for discharge. The court must decide whether Davis presents a substantial risk that he will commit any crime. The district court acknowledged that "both medical experts agreed that Davis has been compliant with his medication regime and that at present, there is not a substantial risk that Davis will commit a crime." The district court did not make a finding that Davis presents a substantial risk to commit a crime. On this record, the court could not make such a finding. Instead, the district court relied on this logic: Davis was *required* to comply with the terms of the conditional release. Under that reasoning, Davis can never be released under N.D.C.C. § 12.1–04.1–25(5)(a) and the plain meaning of the statute is frustrated.

[¶ 48] There is always a potential, a possibility, that a mentally ill person will stop taking his medication. Davis's burden is to show by a preponderance of the

evidence that, at the time of his petition for discharge, he presents no substantial risk of committing a crime. We have defined this evidentiary burden:

A preponderance of the evidence is "evidence more worthy of belief," "the greater weight of evidence," or "testimony that brings the greater conviction of truth." *Jimison v. N.D. Workmen's Comp. Bureau*, 331 N.W.2d 822, 824 (N.D.1983) (citations omitted). That is, the preponderance standard is met by evidence which is more convincing or of greater weight than the opposing evidence, namely, evidence which as a whole shows the fact to be proved is more probable than not. *Black's Law Dictionary* 1182 (6th ed.1990).

*Kraft v. State Bd. of Nursing*, 2001 ND 131, ¶ 21, 631 N.W.2d 572. It is not a burden that requires the elimination of any possibility. The evidence of the two experts about Davis's present status is uncontroverted. Davis has met his burden of proving by a preponderance of the evidence that there is not a substantial risk that he will stop taking his medications, or that he will commit a crime.

[¶ 49] Davis must get his medications somewhere and, as a veteran, wants to get them through the Veterans Administration and continue his therapy through the VA. A discharge would mean Davis would self-arrange these matters as would any other non-committed veteran.

[¶ 50] The district court did not, and this Court does not, have the option of changing the burden of proof and the standard under the statute. The evidence does not support the order issued by the district court. Therefore, I dissent.

[¶ 51] CAROL RONNING KAPSNER